UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEAN K WHITE,<br><br>    Plaintiff,<br><br>  v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS, et al.,<br><br>    Defendants. | Case No. 22-cv-06143-JSC<br><br>**ORDER RE: MOTION TO DISMISS OR STAY**<br><br>Re: Dkt. No. 15 |

Plaintiff brings this lawsuit under the Endangered Species Act of 1973. He alleges Defendants failed to comply with that law and are unlawfully "taking" protected salmon species. Defendants move to dismiss, arguing Plaintiff's claims are "prudentially moot" because the Army Corps have reinstituted the consultation process with the National Marine Fisheries Service. In the alternative, Defendants request the Court stay the matter pending that processes' completion. After reviewing the papers submitted and having had the benefit of oral argument on March 2, 2023, the Court DENIES Defendants' motion. A live controversy remains, and a stay is not warranted at this time.

**BACKGROUND**

**I.    Statutory Background**

The Endangered Species Act of 1973 ("ESA") "contains a variety of protections designed to save from extinction species that the Secretary of the Interior designates as endangered or threatened." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 690 (1995) (citing 16 U.S.C. § 1531). Through the ESA, "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized

caution.'" *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978).  Two ESA provisions (and their accompanying regulations) are relevant here: Section 7 and Section 9.

**A.     Section 7**

Section 7(a)(2) is "the heart of the ESA." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011). It requires federal agencies to ensure any action they authorize, fund, or carry out "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of designated critical habitats." 16 U.S.C. § 1536(a)(2).

Specifically, "Section 7 imposes on all agencies a duty to consult with either the Fish and Wildlife Service or the [National Oceanic and Atmospheric Administration's] Fisheries Service before engaging in any discretionary action that may affect a listed species or critical habitat." *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012).  Consultation can be either formal or informal. 50 C.F.R. §§ 402.13, 402.14. If, after a "Biological Assessment," an agency determines its action "is not likely to adversely affect any listed species or critical habitat" and the consulting agency agrees in writing, informal consultation is complete and no further action is required. *Id.* § 402.13(a).  But if either the acting agency or the consulting agency deems the action is "likely to adversely affect" a listed species or its critical habitat, the agency considering an action must engage in "formal consultation" with the consulting agency.  *Id.* § 402.14(b)(1).

Formal consultation begins when an agency transmits a written request to the consulting agency containing all relevant data required under 50 C.F.R. § 402.14(c).  In response, the consulting agency must prepare a biological opinion "detailing how the agency action affects the species or its critical habitat." 16 U.S.C. 1536(b)(4).  The opinion must also determine whether the action is likely to "jeopardize the continued existence of" a listed species or destroy or adversely modify critical habitats. 50 C.F.R. § 402.14(h).  When formal consultation concludes, the consulting agency issues its biological opinion regarding the likelihood of jeopardy to the listed species or of destruction or adverse modification of critical habitats. *Id.* § 402.14(e).

**B.     Section 9**

ESA Section 9 makes it unlawful for any person to "take" endangered species or engage in other prohibited acts regarding species protected under the ESA. 16 U.S.C. § 1538(a)(1)(B). The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19); *see also Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1141–42 (9th Cir. 2016) (describing statutory scheme).

But not all "takes" are prohibited. *Cold Mountain v. Garber*, 375 F.3d 884, 888 (9th Cir. 2004), *as amended* (Aug. 9, 2004). If, after consultation under Section 7, the consulting agency finds an agency action does not jeopardize a species but may result in "incidental take," a consulting agency issues an "incidental take statement." *Id.* Any taking in compliance with an incidental take statement's terms and conditions is then exempt from the general take prohibition of ESA Section 9. 16 U.S.C. § 1536(b)(4)(iv), (o)(2).

## II.     Complaint Allegations

The Coyote Valley Dam is an earthen dam that impounds water from the East Fork of the Russian River and water imported from the Eel River watershed. (Dkt. No. 1 ¶ 33.) The City of Ukiah, California lies immediately below the dam. (*Id.*) Prior to the dam's construction, Ukiah suffered from floods during high periods of rain. (*Id.*) The Army Corps completed the dam in 1957 and manage it today. (*Id.*) The ability to capture especially high flood flows behind the dam prevents large-scale flooding in Ukiah. (*Id.*)

**A.     The 2008 Biological Opinion**

Consistent with the Endangered Species Act, the Army Corps requested a biological opinion ("the 2008 Opinion") from the National Marine Fisheries Service regarding the impact of the dam's flood control operations on listed species. (*Id.* ¶ 34; *see also* Dkt. No. 1-1.) The National Marine Fisheries Service determined the operations were likely to affect three species of endangered or threatened "salmonids." (*Id.* ¶¶ 34-35; Dkt. No. 1-1 at 11.)

Relevant here, the 2008 Opinion identified a risk from "turbid water." (*Id.*) In short, when the Coyote Valley Dam releases water, that water may have high sediment levels. (Dkt. No. 1

3

¶ 55.) Such sediment "can directly affect salmonids by abrading and clogging gills, and indirectly cause reduced feeding, avoidance reactions, destruction of food supplies, reduced egg and alevin survival, and changed rearing habitat." (Dkt. No. 1-1 at 75.) The 2008 Opinion anticipated turbidity from the Coyote Valley Dam would adversely impact the listed salmonids, but "the precise magnitude of the impact, while expected to be low, [was] unknown." (*Id.* at 341.)

### B.      The Incidental Take Statement

The National Marine Fisheries Service then provided the Army Corps with an "Incidental Take Statement." (Dkt. No. 1 ¶ 36.) That statement covered "taking of listed salmonids that is likely to occur due to the implementation of [the Army Corp's proposed operations]." (*Id.*) But the Incidental Take Statement included eight "Reasonable and Prudent Measures" deemed "necessary and appropriate to minimize the likelihood of take on [the listed salmonids]." (*Id.*) The Incidental Take Statement emphasized that to remain eligible for the Endangered Species Act exemption under Section 7(o)(2), the Reasonable and Prudent Measures "must be undertaken" and were "nondiscretionary." (Dkt. No. 1-1 at 315.)

Reasonable and Prudent Measure No. 4 ("Measure 4") addressed turbidity. (*Id.* at 340.) It contained ten "Terms and Conditions." (*Id.* at 341-342.) These terms include conducting a "bathymetric survey of Lake Mendocino" to determine if dredging is a reasonable alternative to reduce turbidity levels within two years; installing turbidity meters in specific locations before 2009; publishing turbidity data for 10 years; reporting on turbidity monitoring; analyzing turbidity data to determine if flood control operations increase turbidity; submitting that data to the Fisheries Service annually; drafting a plan to minimize any adverse effects found on the relevant species; and implementing plans to minimize and avoid adverse effects by 2014. (*Id.*) Plaintiff alleges the Army Corps failed to comply with Measure 4 other than (belatedly) completing the bathymetric survey. (Dkt. No. 1 ¶¶ 42-53.)

## III.    Procedural Background

### A.      Plaintiff's Action

Plaintiff is a resident of Ukiah, California. (*Id.* ¶ 9.) Plaintiff sent Defendants a "Sixty-Day Notice of Violation of the Endangered Species Act" on August 1, 2022. (Dkt. No. 21-1.) The

4

notice identified Defendants' alleged failure to comply with Measure 4. Plaintiff asserted that because Defendant failed to comply with Measure 4, Defendants had violated Sections 9 and 7 of the ESA. Thus, Plaintiff indicated he would file suit for declaratory and injunctive relief under the ESA to prevent further "unauthorized take" of the listed salmonids below the dam.

On October 18, 2022, Plaintiff filed suit under the ESA's citizen suit provision. 16 U.S.C. 1540(g). Plaintiff alleged Defendants are in violation of ESA Section 7 and the Administrative Procedure Act ("APA") § 706. (Dkt. No. 1 ¶¶ 82-88.) And Plaintiff alleged Defendants are in violation of ESA Section 9 because Defendants' failure to abide by the Incidental Take Statement voids Defendants' exemption from the ESA's take prohibition and makes their actions an "unauthorized take" of the listed species. (*Id.* ¶¶ 78-81.)

Plaintiff requests four forms of relief in the complaint: (1) declaratory relief that the Army Corps is violating Section 9 of the ESA's prohibition against unauthorized take through flood control operations at the Dam; (2) an injunction against Lt. Spellmon, Chief of Engineers, from continuing to make releases of water from Coyote Valley Dam where such releases will cause unauthorized take of listed salmonids; (3) an injunction ordering Defendants to reinitiate formal consultation on the effects of flood control operations at Coyotes Valley Dam; and (4) an injunction ordering the Army Corps to comply with Measure 4. (*Id.* at 29.)

B. **Defendants' Response**

Defendants represented they intend to pursue formal consultation regarding the Coyote Valley Dam's effect on the listed salmonids. Defendants provide two affidavits to support this representation.[1] (Dkt. Nos. 15-1; 15-2.) One affidavit—from Dr. Tessa Eve Beach, Environmental Services Branch Chief for the Army Corps' San Francisco District—notes the Army Corps intends to re-initiate consultation with the National Marine Fisheries Service as of February 28, 2023.

---

[1] In considering a 12(b)(1) motion challenging the facts supporting subject-matter jurisdiction, a court may consider extra-pleading materials submitted by the parties. *Assoc. of American Medical Colleges v. United States*, 217 F.3d 770, 778-79 (9th Cir. 2000); *see also McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) ("Moreover, when considering a motion to dismiss pursuant to Rule 12(b)(1) the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction."). The Court may weigh the evidence without converting the motion into one for summary judgment. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

(Dkt. No. 15-1 ¶ 7.)  The other affidavit—from Robert Coey, Supervising Fisheries Biologist and Branch Chief for the National Marine Fisheries Service's California Coastal Office—declares that if consultation began in February 2023, he expects consultation will conclude in March 2024. (Dkt. No. 15-2 ¶ 6.)  Coey estimated this timeframe because "[t]he last consultation resulted in NMFS's conclusion that the action was expected to jeopardize the continued existence of a listed species, and with that background and our initial review of the draft administrative [Biological Assessment], the consultation is expected to again be complex." (*Id.*)  At oral argument, Defendants confirmed the Army Corps had, in fact, re-initiated consultation in February 2023.

## DISCUSSION

Defendants move to dismiss the litigation as prudentially moot because Defendants reinitiated consultation under the ESA.  In the alternative, Defendants request the Court stay the litigation pending the completion of consultation.  Both requests are denied.

## I.  Defendants' Motion to Dismiss under Rule 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject matter jurisdiction over the action.  Because this dispute presents a justiciable controversy, Defendants' motion to dismiss fails.

### A.  Prudential Mootness

Defendants move to dismiss based on "prudential mootness."  Constitutional mootness is a jurisdictional issue requiring the Court to determine whether a case or controversy exists under Article III of the Constitution. *Maldonado v. Lynch*, 786 F.3d 1155, 1160 (9th Cir. 2015). A case must present a live controversy to resist dismissal for mootness. *Id.* "The party asserting mootness bears the burden of establishing that there is no effective relief that the court can provide." *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006). The burden to establish mootness is heavy. "[A] case is not moot where any effective relief may be granted." *Id.*

"'The doctrine of prudential mootness permits a court to 'dismiss an [action] not technically moot if circumstances have changed since the beginning of litigation that forestall any occasion for meaningful relief. . .'" *Deutsche Bank Nat. Tr. Co. v. F.D.I.C.*, 744 F.3d 1124, 1135 (9th Cir. 2014) (*quoting Hunt v. Imperial Merchant Servs., Inc.*, 560 F.3d 1137, 1142 (9th Cir.

6

2009)). Nearly every circuit has adopted prudential mootness in some form. *People Not Politicians Oregon v. Clarno*, 826 F. App'x 581, 587 n.2 (9th Cir. 2020) (Nelson, J., dissenting) (collecting cases).

But, unlike constitutional mootness, the prudential mootness doctrine is discretionary. *See Hunt v. Imperial Merchant Servs., Inc.*, 560 F.3d 1137, 1142 ("[W]e are not required to dismiss a live controversy as moot merely because it may become moot in the near future.") Indeed, the Ninth Circuit has found a suit prudentially moot only once, when no assets remained for distribution in a bankruptcy proceeding. *See Deutsche Bank*, 744 F.3d at 1135. So, given its sparing use in this circuit, it remains contested whether prudential mootness is a generally applicable doctrine or limited to the bankruptcy context alone. *Compare Maldonado*, 786 F.3d at 1161 n.5 (declining to apply prudential mootness after *Deutsche Bank* stating, "we have not adopted prudential mootness *per se*" and "we have applied prudential mootness only in the bankruptcy context") *with id.* at 1165-66 (Gould, J., dissenting) (urging its application) *and Clarno*, 826 F. App'x at 587 (Nelson, J., dissenting) (same).

Plaintiff urges the Court to reject prudential mootness outright. But the Court need not go that far. Even if prudential mootness is recognized in the Ninth Circuit, it does not apply here.

### B. Application

Defendants have not established Plaintiff is (or soon will be) without any effective relief. The Army Corps and the National Marine Fisheries Service commenced formal consultation in February 2023. The consultation is expected to result in the reissuance of a Biological Opinion and (potentially) an Incidental Take Statement by March 2024. Defendants argue no effective relief remains to remedy Plaintiff's Section 7 claim because Defendants already reinitiated formal consultation. And, because an Incidental Take Statement (if complied with) would exempt the Army Corps from the ESA's take prohibition going forward, Defendants argue Plaintiff's Section 9 claim will also be moot soon. Put differently, Defendants claim they have already given Plaintiff what he can get under the ESA (or will do so soon when consultation is complete). Thus, Defendants argue Plaintiff's claims are (or soon will be) moot. The Court disagrees.

### 1. The Section 7 Claim

As to the Section 7 claim, "the appropriate remedy for violations of the ESA consultation requirements is an injunction pending compliance with the ESA." *Washington Toxics Coal. v. Env't Prot. Agency*, 413 F.3d 1024, 1035 (9th Cir. 2005) *abrogated on other grounds as recognized in Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091–92 (9th Cir. 2015); *see also* 16 U.S.C. § 1536(d) (allowing for injunctions after initiation of consultation). In *Washington Toxics*, for example, the Ninth Circuit affirmed an injunction barring the EPA from acting until the *completion* of formal consultation and the issuance of a biological opinion sanctioning the practice. *Washington Toxics*, 413 F.3d at 1031, 1035 ("[I]t is the very maintenance of the 'status' quo that is alleged to be harming endangered species."). Plaintiff seeks the same remedy here—namely, an order enjoining the Army Corps "from continuing to make releases of water from the Dam where such releases will cause the unauthorized take of [l]isted [s]almonids." (Dkt. No. 1 at 29.)[2]

Thus, Defendants are incorrect that a court may *only* order an agency that violated ESA Section 7 to reinitiate consultation. (Dkt. No. 15 at 21.) A court may *also* order an agency to halt certain activities until that consultation is complete. *See*, *e.g.*, *Yurok Tribe v. United States Bureau of Reclamation*, 231 F. Supp. 3d 450, 490 (N.D. Cal. 2017), *order clarified sub nom. Tribe v. United States Bureau of Reclamation*, 319 F. Supp. 3d 1168 (N.D. Cal. 2018) (entering a preliminary injunction pending completion of formal consultation). So, the Section 7 dispute remains live even though Defendants reinitiated consultation.

### 2. The Section 9 Claim

Declaratory and injunctive relief are also available as to Plaintiff's Section 9 claim because Plaintiff pled facts supporting an inference that unlawful taking may occur before the consultation is complete. (*See* Dkt. No. 1 ¶¶ 36-38, 55, 57, 68-70, 81.) *Compare All. for Wild Rockies v. Burman*, 477 F. Supp. 3d 1151, 1158 (D. Mont. 2020) ("*Rockies (I)*") (denying motion to dismiss

---

[2] At oral argument and in their reply, Defendants contended Plaintiff raised this injunction theory for the first time in opposition to the motion to dismiss. (Dkt. No. 21 at 14.) That is not correct. Plaintiff requested this specific form of injunctive relief in his complaint. (Dkt. No. 1 at 29.) And, as discussed below, his notice of intent to sue fairly put Defendants on notice that he would seek injunctive relief to remedy the identified violations.

1  as prudentially moot because injunctive "and/or" declaratory relief remained after defendants
2  initiated—but had not completed—formal consultation) *with All. for Wild Rockies v. Burman*, 499
3  F. Supp. 3d 786 (D. Mont. 2020) ("*Rockies (II)*") (granting motion to dismiss declaratory relief
4  claim as constitutionally moot in the same matter where formal consultation was, in fact,
5  completed).

### C. Defendants' arguments are unpersuasive.

#### 1. The initiation of consultation does not moot injunctive relief.

First, Defendants argue an injunction "will no longer be relevant once NMFS issues an updated Incidental Take Statement which will authorize the relevant incidental take." (Dkt. No. 15 at 9.) This argument rests on "conjecture." *Rockies (I)*, 477 F. Supp. 3d at 1158. There is no certainty as to the timing or result of the consultation process. *If* the National Marine Fisheries Service completes its consultation in 2024 *and* issues another incidental take statement, then the case *may* become moot. Regarding timing, the last formal consultation regarding the Coyote Valley Dam lasted four years; and the current process—according to Defendants' own witnesses—is expected to be similarly complex. (Dkt. No. 15-2 ¶ 6.) Thus, there is no guarantee Defendants will complete consultation by March 2024. So, what happens in the meantime? *See Rockies (I)*, 477 F. Supp. 3d at 1158 (finding prudential mootness did not apply when Biological Opinion was expected one month later and the offending dam was inoperable because the ESA permits agencies to mutually agree to extend the consultation period, the dam could be fixed, and harm could occur in the intervening period).

Prudence does not counsel mootness under such contingent circumstances. *See id.* (declining "to engage in conjecture to presume the consultation will eliminate [the plaintiff's] ability to receive any meaningful relief."). Thus, because a status quo preserving injunction could provide Plaintiff meaningful relief pending completion of the relevant consultation, Defendants' argument on this point fails.

#### 2. Non-Discretionary Action

Defendants also argue an injunction altering dam operations may not be feasible, given other statutory duties assigned to the Army Corps. Defendants explain:

9

> While authorized purposes differ for each dam, at this Dam, Congress' authorized purposes are flood control, water conservation, and related purposes. *Id.* Water Control Manuals are prepared for each dam, pursuant to Engineering Regulation 1110-2-240, p. 3-1. The manuals specify how the Dam and Lake Mendocino reservoir will be operated to adhere to the authorized purposes. *Id.* Accordingly, the Court cannot just order the Corps to deviate from the current Water Control Manual and cease or modify the carefully developed flood control operations. **Depending on the circumstances, such an order would not only be inadvisable, but could potentially be in conflict with actions the Corps is required to take under its flood control obligations**.

(Dkt. No. 21 at 15) (emphasis added). Put differently, citizen suits are only authorized to challenge non-discretionary agency actions. *See Bennett v. Spear*, 520 U.S. 154, 155 (1997)(citing § 1540(g)(1)(C)). Thus, Defendants argue an injunction *could* cause conflict with other statutory duties the Army Corps is required to undertake. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 645 n.49 (9th Cir. 2014) (noting that a court may not issue an injunction enforcing the NEPA if doing so would cause an agency to violate other statutory requirements).

This argument fails. By Defendants' own admission, it is uncertain whether any potential injunction would create an irreconcilable conflict with a non-discretionary agency duty. That an injunction *may* not ultimately be viable does not mean the underlying claim is moot.

### 3. Plaintiff met the ESA's procedural requirements.

Defendants also argue Plaintiff failed to comply with the ESA's procedural requirements when requesting injunctive relief. In Defendants' reply brief, Defendants claim (for the first time) this Court lacks jurisdiction over Plaintiff's requests for injunctive relief because "they were not in Plaintiff's notice of intent ("NOI") to sue nor are they reasonably related to claims contained in that notice of intent to sue."[3] (Dkt. No. 21 at 14.) The Court disagrees.

The ESA does contain strict procedural requirements. "A private citizen may bring suit to remedy a violation of the ESA, provided that it gives written notice of the alleged violation or

---

[3] Defendants raised this argument as to other requests for injunctive relief (including a request for status reports on consultation and a request to withdraw the 2008 Biological Opinion and Incidental Take Statement). (Dkt. No. 21 at 14.) Because the Court finds a live controversy exists as to Plaintiff's request for an injunction regarding Dam operations, the Court need not reach the viability of these other potential forms of relief at this stage. The Court also need not address Plaintiff's argument that these injuries are capable of repetition yet avoiding review.

10

violations upon which the suit is based at least sixty days before suit is filed." *Klamath-Siskiyou Wildlands Ctr. V. MacWhorter*, 797 F.3d 645, 647 (9th Cir. 2015); *see also* 16 U.S.C. § 1540(g)(2)(A)(i) ("No action may be commenced . . . prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator. . .."). The sixty-day notice requirement is jurisdictional. *Sw. Ctr. For Biological Diversity v. U.S. Bureau of Reclamation* (*"Southwest"*), 143 F.3d 515, 520 (9th Cir.1998). "A failure to strictly comply with the notice requirement acts as an absolute bar to bringing suit under the ESA." *Id.* To provide proper notice of an alleged violation, a would-be plaintiff must:

> "[a]t a minimum . . . provide sufficient information . . . so that the [notified parties] could identify and attempt to abate the violation." *Soutwest*, 143 F.3d at 522 (citing *Pub. Interest Research Grp. Of N.J., Inc. v. Hercules, Inc. (Hercules)*, 50 F.3d 1239, 1249 (3d Cir. 1995)). A citizen "'is not required to list every specific aspect or detail of every alleged violation. Nor is the citizen required to describe every ramification of a violation.'" *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 951 (9th Cir. 2002) (quoting *Hercules*, 50 F.3d at 1248). Rather, the analysis turns on the "overall sufficiency" of the notice. *Id.*; *see also Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir.1996) (examining "the letter as a whole" for sufficiency of notice). A reviewing court may examine both the notice itself and the behavior of its recipients to determine whether they understood or reasonably should have understood the alleged violations.

*Klamath-Siskiyou*, 797 F.3d at 651 (cleaned up).

Plaintiff's notice meets that standard. Plaintiff's letter specifically identified the alleged violating activities (Defendants' turbid water releases at the dam, Defendants' failure to abide by Measure 4, and the alleged resulting "unauthorized" take of salmonids), the time frame of the violations (from 2008 onward), and his intent to sue (for injunctive and declaratory relief). (Dkt. No. 21-1.) Defendants argue because Plaintiff challenged non-compliance with Measure 4 (which deals with turbidity) rather than Measure 3 (which concerns flood control operations), Plaintiff cannot now seek an injunction to limit flood control operations' effects (i.e., turbidity) on the salmonids. That argument is unpersuasive. 16 U.S.C. § 1540(g)(2)(A) requires Plaintiff give notice of "the violation," not every remedy sought because of that violation. Plaintiff did so. And, as discussed above, the remedy for ESA violations like noncompliance with Measure 4 (or

11

1   unlawful takings under Section 9) can be an injunction to protect species. 16 U.S.C. § 1540(1).

2   Defendants cite no authority limiting the scope of such an injunction in the manner they suggest.

3         Defendants' sole cited authority is inapposite. Defendants cite *Center For Biological Diversity v. Marina Point Development Company* for the proposition that "when a notice told the defendant that it had committed one specific violation, the defendant was not 'required to speculate as to all possible attacks . . . that might be added to a citizen suit' at a later time." 566 F.3d 794, 802 (9th Cir. 2009) (quoting *ONRC Action v. Columbia Plywood, Inc.*, 286 F.3d 1137, 1143 (9th Cir. 2002). But, in that case, the flaw in the notice letter was a failure to specify the relevant dates and specific law violations at issue. *Id.* Here, in contrast, Plaintiff gives detailed notice of the alleged violation and his intent to seek injunctive relief under specific provisions in the ESA to protect the listed species from unlawful takes. So, unlike in *Marina Point*, Plaintiff's letter put Defendant on notice as to the content of the alleged violation. *See* 16 U.S.C. § 1540(g)(2)(A)(i)

\* \* \*

In sum, Defendants' motion to dismiss is DENIED because effective relief remains possible if Plaintiff prevails.

## II.  Defendants' Motion to Stay Litigation

In the alternative, Defendant asks the Court to stay the litigation until consultation is complete. The Court declines to do so.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the cause on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). In determining whether a stay is warranted, courts should balance the risk of hardship to the parties and evaluate the likelihood that a stay will serve the interests of judicial economy. *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005). If "there is even a fair possibility that the stay will work damage to someone else, the party seeking the stay must make out a clear case of hardship or inequity." *Lockyer*, 398 F.3d at 1112 (internal quotations omitted).

Contrary to Defendants' position, a stay could harm Plaintiff by allowing Defendants "to

engage in unlawful behavior with no concrete end date." *Rockies I*, 477 F. Supp. 3d at 1158-59. Plaintiff pleads such harms are possible. (*See* Dkt. No. 1 ¶¶ 36-38, 55, 57, 68-70, 81.)  In response, Defendants only cite litigation burdens.  But the Ninth Circuit has previously found the requirements of litigation are insufficient to establish hardship. *See Lockyer*, 398 F.3d at 1112 ("[B]eing required to defend a suit, without more, does not constitute a clear case of hardship or inequity.") (cleaned up).  Thus, on balance, the Court denies Defendants' motion for a stay.

## CONCLUSION

Defendants' motion to dismiss, or in the alternative stay, is DENIED.  The Court sets an initial case management conference via Zoom Video for March 30, 2023 at 1:30 p.m.  A joint case management statement is due one week in advance.

**IT IS SO ORDERED.**

This Order disposes of Docket Number 15.

Dated: March 3, 2023

JACQUELINE SCOTT CORLEY
United States District Judge

13