1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7   SEAN K WHITE,                           Case No. 3:22-cv-06143-JSC

8                  Plaintiff,

9         v.                                **ORDER RE: MOTION FOR
                                            PRELIMINARY INJUNCTION**
10  UNITED STATES ARMY CORPS OF             Re: Dkt. No. 50
    ENGINEERS, et al.,
11
                   Defendants.
12

13          Plaintiff moves for a preliminary injunction under the Endangered Species Act of 1973

14  ("ESA").  He alleges Defendants' "flood control releases," which release water from the Coyote

15  Valley Dam into the Russian River, are injuring protected species of salmonids.  After carefully

16  considering the parties' submissions and having had the benefit of oral argument on October 17,

17  2023, the Court DENIES Plaintiff's motion.  Plaintiff failed to establish the "serious or extreme"

18  harm he admits is required for issuance of a preliminary injunction.  Moreover, even if Plaintiff

19  had established such harm, Plaintiff failed to demonstrate his proposed injunction will remedy the

20  harm he alleges.

21                              **BACKGROUND**

22  **I.    THE COYOTE VALLEY DAM'S FLOOD CONTROL RELEASES**

23          The United States Army Corps of Engineers constructed the Coyote Valley Dam, which in

24  turn created Lake Mendocino, more than fifty years ago.  (Dkt. Nos. 1 ¶ 33; 51-2 ¶ 4.) [1]  Before the

25  creation of the dam, the city of Ukiah, which is located immediately below the dam, suffered from

26

27  _____

28  [1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
    ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

floods during heavy rains.  (*Id.*)  The dam was created to help mitigate that flooding, as well as for "water supply, recreation, and streamflow regulation."  (Dkt. No. 1 ¶ 33.)

Today, the Army Corps of Engineers continues to operate the Coyote Valley Dam for flood control.  (*Id.*)  The Army Corps maintains a "Top of Conservation Pool" value, a variable reservoir storage amount that changes throughout the year.  (Dkt. No. 51-2 ¶ 6.)  The lake is in "flood control operations" whenever reservoir storage is above the Top of Conservation Pool value.  (*Id.*)  In the last 11 water years, "flood control releases"—or times when Defendants "evacuate[d] flood control storage" from the dam such that the dam's outflow exceeded the inflow of water into the dam—"only occurred five times."  (*Id.* ¶¶ 11-13.)  According to Defendants, "[a]ll flood control releases reduce the threat to life and property below the Coyote Valley Dam" because flood control releases "persist to the extent necessary to restore flood control storage for future storms."  (Dkt. No. 51-2 ¶ 21.)

The dam has "one controlled outlet for water releases," located "near the bottom of Lake Mendocino."  (Dkt. No. 50-2 ¶ 8.)  Water released from the dam flows into the "East Fork" of the Russian River.  (Dkt. No. 51-2 ¶ 27.)  After about 0.5 miles, the East Fork of the Russian River meets with the West Fork of the Russian River, flowing into the Russian River mainstream.  (*Id.* at 51-1, Figure 1.)

## II.    PROTECTED SPECIES

Under the Endangered Species Act ("ESA"), three species of salmonids in the Russian River are protected as threatened or endangered: the Central California Coast Steelhead ("CCC Steelhead"), the Central California Coast Coho Salmon ("CCC Coho") and the California Coast Chinook Salmon (CC Chinook).  (Dkt. No. 1-1 at 6.)  CCC Steelhead and CC Chinook are threatened, 71 Fed. Reg. 834-01, 857 (Jan. 5, 2006) & 70 Fed. Reg. 37160-01, 37192 (June 28, 2005), and CC Coho are endangered.  70 Fed. Reg. at 37192.   Moreover, the National Marine Fisheries Service has designated the Russian River as a critical habitat for all three species.[2]  (Dkt.

---

[2] While Plaintiff's motion references all three species, "CCC coho salmon have not been observed in the upper Russian River for decades."  (Dkt. No. 51-1 ¶ 26.)  Thus, this Order focuses on any potential impacts to the Russian River's CCC Steelhead and CC Chinook Salmon populations.

United States District Court
Northern District of California

No. 1-1 at 6, 64 Fed. Reg. 24049-02 (May 5, 1999) (designating critical habitat for the Evolutionarily Significant Unit of CC Coho); 70 Fed. Reg. 52488-01 (Sept. 2, 2005) (designating critical habitat for the Evolutionary Significant Unit of CC Chinook and the Distinct Population Segment of CCC Steelhead).

The National Marine Fisheries Service defines a "species" of salmon as a "distinct population" that "represents an evolutionary significant unit (ESU) of the biological species." 56 Fed. Reg. 58612-01 (Nov. 20, 1991). The Endangered-Species-Act-listed threatened CC Chinook Salmon Evolutionary Significant Unit "includes all naturally spawned chinook salmon originating from rivers and streams south of the Klamath River to and including the Russian River, approximately 1641 miles of streams." (Dkt. No. 51-1 ¶ 34.) The Russian River population of CC Chinook is a subset of that evolutionary significant unit.

The CCC Steelhead are a "Distinct Population Segment," and therefore also qualify for listing in the Endangered Species Act. 61 Fed. Reg. 4722-01 (Feb. 7, 1996). The Endangered-Species-Act-listed threatened CCC Steelhead Distinct Population Segment consists of "naturally spawned as well as some hatchery populations originating from rivers and streams within and including the Russian River watershed south to the Aptos Creek watershed, which is approximately 1542 miles of streams." (Dkt. No. 51-1 ¶ 34). The upper Russian River population of CCC Steelhead is a subset of that distinct population segment.

### III.    THE COYOTE VALLEY DAM'S IMPACT ON PROTECTED SPECIES

Between January and May 2023, Mr. White collected samples of water from five locations in the upper Russian River watershed around the Coyote Valley Dam. (Dkt. No. 50-2 ¶¶ 18, 20.) He then took these samples to Alpha Labs, an Environmental Laboratory Accreditation Program certified laboratory, for turbidity analysis. (Id. ¶ 20.) Turbidity is a measure of the clarity of water—greater turbidity means more "suspended particles in the water scatter light and reduce the passage of light through a body of water." (Dkt. No. 50-11 ¶ 10.) One of the locations Mr. White sampled, "Site 4," is located 0.40 miles below the outlet of Coyote Valley Dam, on the East Fork of the Russian River. (Dkt. No. 50-2 ¶ 19.) According to Plaintiff, "[w]hen compared to all other sites, turbidity from Site 4 ([Coyote River Dam]) is higher and more persistent than the receiving

waters (Site 1-3) as well as source water (Site 5)."  (*Id.* ¶ 22.)  Increased turbidity negatively impacts salmonids, leading to impacts such as "reduce[d] embryo survival," "reduce[d] available space and [] quality of habitat and cover for juvenile salmonids," "reduced perception of risk and reduced escape-to-cover response, delayed predator avoidance, and impaired feeding success and efficiency."  (Dkt. No. 50-11 ¶¶ 25-27, 35, 37.)  Defendants admit elevated turbidity from the dam's outflows has likely resulted in "some adverse effects to habitat, and effects to species individuals and life stages."  (Dkt. No. 51-1 ¶ 40.)

## IV.   PROCEDURAL BACKGROUND

Plaintiff moves for a preliminary injunction, requesting the Court order Defendants to (1) refrain from making flood control releases unless Defendants determine such a release will reduce threat to life and property below Coyote Valley Dam, report to the Court either seven days before or after the release, and obtain court permission if the release extends more than 30 days; (2) complete any unperformed components of Reasonable and Prudent Measure Number 4 of the Army Corps' Incidental Take Statement and provide quarterly status reports to the Court on their progress; and (3) adjust flood control releases to reduce the effects of turbidity on the Listed Salmonids, analyze turbidity's effects on the Listed Salmonids resulting from the adjusted flood control releases, and provide a quarterly status report to the Court on their findings.  (Dkt. No. 50 at 22.)

## DISCUSSION

## I.   LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Wildlands Def. v. Seesholtz*, 755 F. App'x 640, 641 (9th Cir. 2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Plaintiff brings this case under the Endangered Species Act, which "strips courts of at least some of their equitable discretion in determining whether injunctive relief is warranted."  *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1090 (9th Cir. 2015).  Because the

Endangered Species Act establishes an "unparalleled public interest" in preserving endangered species, the remedies available at law are presumed inadequate and public interest is presumed to weigh in the Plaintiff's favor. *Id.* However, the Endangered Species Act "does not allow courts to put their 'thumb on the scales' in evaluating" whether the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief. *Id.* (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010)).

## II.     LIKELIHOOD OF SUCCESS ON THE MERITS

"A preliminary injunction is appropriate when a plaintiff demonstrates" either a likelihood of success on the merits of their claim or "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (quoting *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)).

Claims under the Endangered Species Act are reviewed under the Administrative Procedure Act ("APA"). *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014); 5 U.S.C. § 706(2)(A). This standard of review is "highly deferential" to the agency's decisions. *Id.* "In reviewing claims brought under the APA, [courts] will only set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011) (quoting 5 U.S.C. § 706(2)(A)). "An agency will have acted arbitrarily and capriciously only when 'the record plainly demonstrates that [the agency] made a clear error in judgment.'" *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1052 (9th Cir. 2012) (quoting *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124 (9th Cir. 2012)).

Under the Endangered Species Act, an agency must base its actions on evidence supported by "the best scientific and commercial data available," but "it is not required to support its finding that a significant risk exists with anything approaching scientific certainty." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601–02 (9th Cir. 2014) (quoting 16 U.S.C. § 1536(a)(2) and *Indus. Union Dep't v. Am. Petroleum Inst.*, 448 U.S. 607, 656 (1980) (plurality opinion)).

### 1.    Plaintiff's ESA Act Section 9 Claim

ESA Section 9 makes it unlawful for any person to "take" endangered species or engage in other prohibited acts regarding species protected under the ESA.  16 U.S.C. § 1538(a)(1)(B).  The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).  "Harm" includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  50 C.F.R. § 17.3; *see also Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 696–700 (1995).

But not all "takes" are prohibited.  *Cold Mountain v. Garber*, 375 F.3d 884, 888 (9th Cir. 2004), *as amended* (Aug. 9, 2004).  If, after consultation under Section 7, the consulting agency finds an agency action does not jeopardize a species but may result in "incidental take," a consulting agency issues an "incidental take statement."  *Id.*  Any taking in compliance with an incidental take statement's terms and conditions is then exempt from the general take prohibition of ESA Section 9.  16 U.S.C. § 1536(b)(4)(iv), (o)(2).

The National Marine Fisheries Service provided the Army Corps with an "Incidental Take Statement." (Dkt. No. 1 ¶ 36.)  That statement covered "taking of listed salmonids that is likely to occur due to the implementation of [the Army Corp's proposed operations]."  (*Id.*)  The Incidental Take Statement included eight "Reasonable and Prudent Measures" deemed "necessary and appropriate to minimize the likelihood of take on [the listed salmonids]."  (*Id.*)  The Incidental Take Statement emphasized that to remain eligible for the Endangered Species Act exemption under Section 7(o)(2), the Reasonable and Prudent Measures "must be undertaken" and were "nondiscretionary."  (Dkt. No. 1-1 at 315.)

Reasonable and Prudent Measure Number 4 addressed turbidity.  (*Id.* at 340.)  It contained 10 "Terms and Conditions."  (*Id.* at 341-342.)  These terms include conducting a "bathymetric survey of Lake Mendocino" to determine if dredging is a reasonable alternative to reduce turbidity levels within two years; installing turbidity meters in specific locations before 2009; publishing turbidity data for 10 years; reporting on turbidity monitoring; analyzing turbidity data to determine

United States District Court
Northern District of California

1   if flood control operations increase turbidity; submitting that data to the Fisheries Service

2   annually; drafting a plan to minimize any adverse effects found on the relevant species; and

3   implementing plans to minimize and avoid adverse effects by 2014.  (*Id.*)  Plaintiff alleges the

4   Army Corps failed to comply with Measure 4 other than (belatedly) completing the bathymetric

5   survey, and therefore Defendants have committed an unauthorized take under Section 9 of the

6   ESA.  (Dkt. No. 1 ¶¶ 42-53.)

7        Defendants admit they have not complied with all the conditions of Reasonable and

8   Prudent Measure Number 4.  (Dkt. No. 35 ¶ 52.)  Further, the Incidental Take Statement expired

9   on September 23, 2023, meaning any "safe harbor" for incidental takes no longer exempts

10  Defendants from liability.  (Dkt. No. 15-2 ¶ 2.)

### 2.      Plaintiff's Claims Are Not Moot

12       In their motion to dismiss, Defendants argued Plaintiff's claims were moot because

13  Defendants were "in the process of reinitiating formal consultation with [the National Marine

14  Fisheries Service], which is the remedy for both of Plaintiff's claims."  (Dkt. No. 15 at 14.)  The

15  Court rejected this argument because there was no guarantee Defendants will complete

16  consultation by March 2024.  (Dkt. No. 26.)  Defendants have "resubmit[ed]" their argument that

17  "issuance of a new, superseding Biological Opinion will render this entire case constitutionally

18  moot."  (Dkt. No. 51 at 24.)  Defendants expect the National Marine Fisheries Service to issue a

19  new Biological Opinion "within 135 days (with a potential for a 60-day extension)" after the

20  National Marine Fisheries Service has "determine[d] that [it has] received a sufficient [Biological

21  Assessment]."  (Dkt. No. 51-1 ¶ 22.)

22       However, for the same reasons discussed in this Court's previous order, Defendants'

23  mootness argument is unavailing.  (Dkt. No. 26.)  The National Marine Fisheries Service has not

24  yet determined it has received a sufficient Biological Assessment—meaning the anticipated 135-

25  day-countdown (or, 195-day-countdown if the National Marine Fisheries Service requests an

26  extension) has not yet begun.  So, the timeline for issuing a new Biological Opinion extends well

27  into 2024—and therefore includes this winter's rainy season.  Plaintiff's proposed preliminary

28  injunction restrains Defendants' actions *during* this winter's rainy season before any Biological

Opinion is likely to be issued.  For these reasons, and for the reasons discussed in the Court's previous order, Plaintiff's claim is not moot.

### 3. Plaintiff Established A Likelihood of Success on his Claim a "Take" is Likely to Occur

Plaintiff has established he is likely to succeed on the merits of his ESA Section 9 claim. Defendants admit they have not complied with all the conditions of Reasonable and Prudent Measure Number 4.  (Dkt. Nos. 35 ¶ 52; 51 at 24 ("The corps is now in compliance, or *will soon come into compliance,* with all terms and conditions of [Reasonable and Prudent Measure] No. 4" (emphasis added).)  So, Defendants were not eligible for an ESA exemption and any previous take violated ESA Section 9.  Moreover, since the Incidental Take Statement expired on September 23, 2023, any take of the listed salmonids since then, or any future take until the issuance of a new Incidental Take Statement, subjects Defendants to liability.  (Dkt. No. 15-2 ¶ 2.)

Plaintiff relies on his own evidence collection to establish the "take" of protected species has occurred and is likely to occur again.  Specifically, Plaintiff urges the elevated turbidity he identified at 0.4 miles below the outlet of the Coyote Valley Dam, what he calls "Site 4," is a direct result of the dam's flood releases.  (Dkt. No. 50-2 ¶ 22.)  He contends this elevated turbidity at Site 4 causes a "take" of the listed species.  Robert Klamt, a fish biologist who specializes in salmonid species, asserts "the sediment-laden discharges from Coyote Valley Dam . . . have negatively affected and will continue to affect federally listed anadromous salmonids" which "add to other mortality factors and imperil the viability of the species in the Russian River watershed." (Dkt. No. 50-11 ¶ 7.)  Based on the average temperature for the river, the average suspended sediment as calculated from Mr. White's samples at site 4, and a two-week exposure duration, Mr. Klamt estimated from January through May 2023 the suspended sentiment in the river caused the "total mortality" of CC Chinook and CCC Steelhead eggs at the East Fork location.  (Dkt. No. 50-11 ¶¶ 61-67.)

According to Plaintiff, "[f]actors in the streams where these listed species spawn, incubate, rear as juveniles, and outmigrate to the ocean have a role in the survival of any single year class," and those "impacts translate into the future with lower returns of adults, producing a cascade of

reduced survival that puts the species in jeopardy." (Dkt. No. 52 at 8; 50-11 ¶¶ 10-12.)  Since flood control releases have occurred five times in the last eleven years, if Plaintiff's analysis is correct, those flood control releases should have already had an appreciable impact on the salmonid populations. (Dkt. No. 51-2 ¶ 13.)

The available data does not definitively indicate whether the dam's flood control releases have led to a decline in the CC Chinook or CCC Steelhead populations.  Plaintiff has provided no direct evidence any individual salmonid has been harmed by the previous years' flood releases. Defendants have provided the yearly count of adult CC Chinook in the mainstem Russian River from 2000 until 2022.[3] (Dkt. No. 51-3 at 7, fig. 10.)  The data shows the CC Chinook population has declined since 2012—from a peak of 6,730 adult CC Chinook to only 1,180 in 2022. (*Id.*) However, the data is not directly correlated with the dam's flood releases.  For example, 2016 was a flood control release year—meaning, if Plaintiff's analysis was correct, one would expect the 2016 flood releases to harm young CC Chinook, leading to a decline in the CC Chinook population in 2017. (Dkt. No. 50-2 at 5 fig. 1 (showing the 2016 water storage exceed the water supply pool, thus necessitating flood control releases from approximately February through April of 2016); Dkt. No. 51-2 ¶ 22 (explaining in the past 11 water years, "the shortest period between the start of flood control releases being approximately 9-months in 2016.").)  Yet, in 2017, the Chinook population increased from the 2016 total of 1,062 to the 2017 total of 2,093. (Dkt. No. 51-3 at 7, fig. 10.)  According to Defendants, this data demonstrates "there is no evidence that turbidity in the Russian River . . . is driving chinook salmon population trends," and instead "the population trends in the Russian River seem to be tracking region-wide trends that are largely driven by drought." (Dkt. No. 51-3 ¶ 15.)

However, Defendants also admit "some adverse effects to habitat, and effects to species

---

[3] Defendants do not provide equivalent data for the CCC Steelhead populations.  Instead, they provide a chart representing "Juvenile steelhead population estimates and sampling effort in [Life Cycle Monitoring] watersheds during end-of-summer 2022." (Dkt. No. 51-3 at 6 tbl. 4.)  The data includes juvenile steelhead from the Mill Creek and Green Valley watersheds, which are tributaries to the Russian River. (*Id.* ¶ 10.)  However, Defendants do not present any data as to the CCC Steelhead population numbers in the mainstem of the Russian river, where the dam flows into.  Nor do Defendants provide any data from years other than 2022, so no conclusions about yearly trends can be drawn from the CCC Steelhead data.

United States District Court
Northern District of California

individuals and life stages are likely occurring" because of the downstream turbidity.  (Dkt. No. 51-1 ¶ 40.)  Thus, Defendants have admitted they likely engaged in a "take," and Plaintiff has established a likelihood of success on the merits.

Defendants argue Plaintiff has not shown a likelihood of success on the merits because Plaintiff failed to establish proximate cause, and there has been no link between Defendants' actions and the "take."  Specifically, Defendants argue Plaintiff "has not shown how the Corps' failure to perform a specific term and condition of [Reasonable and Prudent Measure] No. 4 (most of which was related to monitoring and data collection) was the direct and proximate cause of any alleged take of CCC steelhead or CC Chinook."  (Dkt. No. 51 at 25.)  According to the Incidental Take Statement, for Defendants to remain eligible for the ESA exemption under Section 7(o)(2), the Reasonable and Prudent Measures "must be undertaken" and were "nondiscretionary." (Dkt. No. 1-1 at 315.)  Because Defendants admit they have not complied with all the conditions of Reasonable and Prudent Measure Number 4, Defendants were not eligible for an ESA exemption and any take violated ESA Section 9.  *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 886 F.3d 803, 813 (9th Cir. 2018) ("*If followed* the Incidental Take Statement exempts [] action agency from the prohibition on takings found in section 9 of the ESA." (emphasis added)); *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt*., 273 F.3d 1229, 1239 (9th Cir. 2001) ("[I]f the terms and conditions of the Incidental Take Statement are disregarded and a taking does occur, the action agency or the applicant may be subject to potentially severe civil and criminal penalties under Section 9."); *Bennett v. Spear*, 520 U.S. 154, 170 (1997) (explaining an agency is "technically free to disregard the Biological Opinion and proceed with its proposed action, but it does so at its own peril (and that of its employees), for 'any person' who knowingly 'takes' an endangered or threatened species is subject to substantial civil and criminal penalties, including imprisonment.").  Moreover, Reasonable and Prudent Measure Number 4 was contained within the Incidental Take Statement which expired on September 23, 2023—meaning any safe harbor under that provision expired.  (Dkt. No. 15-2 ¶ 2.) Plaintiff does not need to show how the Corps' failure to comply with an expired rule will lead to the take, but rather that Defendants' actions are likely to lead to a take.  Since Defendants admit

United States District Court
Northern District of California

turbidity has likely harmed salmonid population and habitats (Dkt. No. 51-1 ¶ 40), and Defendants admit the dam's flood control releases resulted in elevated turbidity levels in the Russian River (Dkt. No. 51-1 ¶¶ 27-29 ("Photographic documentation indicates . . . the turbidity released from [the Coyote Valley Dam] can be noticeably higher, and increases the levels in the mainstem Russian River downstream"), Plaintiff has established proximate cause between Defendants' actions and the alleged take.

### III.   IRREPARABLE INJURY

"[P]laintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). "An injunction will not issue if the person or entity seeking injunctive relief shows a mere 'possibility of some remote future injury,' or a 'conjectural or hypothetical' injury." *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008) and *City of L.A. v. Lyons*, 461 U.S. 95, 102, 106 n.7 (1983)) (cleaned up)).

The Ninth Circuit has not clarified what suffices for "likelihood" in the context of irreparable injury. However, the Ninth Circuit's treatment of the likelihood of success on the merits prong of the preliminary injunction analysis is instructive, as both prongs turn on the "likelihood" standard. The court has indicated "[t]o establish a substantial likelihood of success on the merits, [plaintiffs] must show 'a fair chance of success.'" *In re Focus Media Inc.*, 387 F.3d 1077, 1086 (9th Cir. 2004) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir.1988) (en banc)). Moreover, a party seeking a preliminary injunction is not required to "demonstrate that it is more likely than not that they will win on the merits." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011). So, the Court will assess "likelihood" as requiring Plaintiff to establish a "fair chance" of irreparable injury—something more than a mere possibility but requiring less than a preponderance of the evidence.

### A.   Plaintiff Has Established a Flood Control Release Is "Likely"

Plaintiff's theory of injury alleges each time Defendants conduct a flood control release, releasing water into the Upper Russian River, the listed salmonids are harmed because the released

11

water increases the turbidity of the river.  Plaintiff asserts, given the history of flood control releases and the current water storage at Lake Mendocino, "there is a very strong likelihood of the Army Corps conducting Flood Control Releases" in the upcoming months.  (Dkt. No. 50-2 ¶¶ 13-15.)  While weather is inherently unpredictable and uncertain, Plaintiff has demonstrated at least a "fair chance" flood control releases will occur this year.

Defendants argue Plaintiff's prediction about the future weather and the likelihood of flood control releases is flawed.  First, Defendants point out "flood control releases have only occurred five times in the last eleven water years."  (Dkt. No. 51-2 ¶ 13.)  Second, Defendants assert Plaintiff's projections are based on incomplete analysis.  Dr. Nicholas Eugene Malasavage, the Operations and Readiness Division Chief for the United States Army Corps of Engineers, asserts "based on the current Lake Mendocino Storage Projection, the likelihood of release . . . is low-to-moderate."  (*Id.*)  According to Defendants, such "[s]peculative, future injury cannot support injunctive relief."  (Dkt. No. 51 at 15.)

However, Dr. Malasavage's declaration also details the complexity involved in Defendants' decision to initiate a flood control release.  Specifically, he explains Defendants' Water Control Manual and Water Control Plan "do not attempt to provide explicit direction for all real-world scenarios" because Defendants' flood control release decisions are made "in an environment of rapidly changing, and often uncertain, operational information."  (Dkt. No. 51-2 ¶ 15.)  According to Dr. Malasavage, "[i]t is common for flood control release decisions to be updated or verified up to 4-times per day" and the "event horizon for executing a 'flood control release' is typically 12 to 48 hours."  (*Id.* ¶¶ 16-17.)  Given the rapidly changing nature of flood control release decisions, and the historical fact flood control releases occurred in five out of the last eleven water years, Plaintiff has met its burden of establishing a flood control release is likely to occur this year.

**B.     Plaintiff Failed to Establish Flood Control Releases Will Likely Result in Irreparable Harm**

**1.     Meaning of "Irreparable Harm"**

"Irreparable harm should be determined by reference to the purposes of the statute being

United States District Court
Northern District of California

1   enforced." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018)

2   (citing *Garcia v. Google*, 786 F.3d 733, 744-45 (9th Cir. 2015) (en banc)).  The purpose of the

3   Endangered Species Act is "to provide a means whereby the ecosystems upon which endangered

4   species and threatened species depend may be conserved, [and] to provide a program for the

5   conservation of endangered species and threatened species."  16 U.S.C. § 1531(b).  Given the

6   purpose of the Endangered Species Act, "[s]howing an extinction-level threat to listed species is

7   not required before an injunction can issue." *Nat'l Wildlife Fed'n*, 886 F.3d at 819.  "The

8   [Endangered Species Act] accomplishes its purpose in incremental steps, which include protecting

9   the remaining members of a species." *Id.* at 818.  "Harm to those members is irreparable because

10  [o]nce a member of an endangered species has been injured, the task of preserving that species

11  becomes all the more difficult." *Id.* (cleaned up).

12          The parties dispute what level of threat is necessary to qualify as "irreparable harm."

13  Defendants assert harm must be measured at the species level rather than assessing potential

14  impacts to individual animals.  Defendants cite *Marbled Murrelet v. Babbitt* for the proposition "a

15  plaintiff must show '[a] reasonably certain threat of imminent harm to a protected species.'"  (Dkt.

16  No. 51 at 17 (quoting *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996), *as*

17  *amended on denial of reh'g* (June 26, 1996).)  However, the *Marbled Murrelet* defendants'

18  argument was "no injunction may issue until the death or injury of a protected species has actually

19  occurred." *Id.* at 1065.  The Ninth Circuit clarified injunctions can be based on the threat of future

20  harm to a species even if no past harm had been proven.  Moreover, *Marbled Murrelet* held "[a]

21  reasonably certain threat of imminent harm to a protected species is *sufficient* for issuance of an

22  injunction under section 9 of the [Endangered Species Act]"—not that proof of species-level harm

23  is necessary nor required. *Id.* at 1066 (emphasis added).  Finally, as Plaintiff points out, the Ninth

24  Circuit's more recent ruling in *National Wildlife Federation v. National Marine Fisheries Services*

25  indicated "[h]arm to . . . members" of a species "is irreparable." *Nat'l Wildlife Fed'n*, 886 F.3d at

26  818.

27          District courts are split on whether to analyze harm on the species-wide level or based on

28  the individual animal level.  Some district courts have asserted irreparable harm requires evidence

13

of species-level harm.  *See Pac. Coast Fed'n of Fishermen's Associations v. Gutierrez*, 606 F. Supp. 2d 1195, 1207 (E.D. Cal. 2008) ("The Ninth Circuit test requires that agencies not take actions as to species that will reduce appreciably their likelihood of survival or recovery or appreciably diminish the value of their critical habitat."); *Defs. of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1210 (D. Mont. 2009) ("[C]ourts have found that the death of a small number of individuals may constitute irreparable harm, but this situation exists when the loss of those individuals would be significant for the species as a whole.") (cleaned up); *Wild Equity Inst. v. City & Cnty. of San Francisco*, No. C 11-00958 SI, 2011 WL 5975029, at *7 (N.D. Cal. Nov. 29, 2011) ("No court has held that as a matter of law, the taking of a single animal or egg, no matter the circumstance, constitutes irreparable harm.").  However, these district court rulings were called into question by *National Wildlife Federation v. National Marine Fisheries Service*.  886 F.3d 803, 819 (9th Cir. 2018).  For example, in *Defenders of Wildlife v. Salazar,* the court concluded "to consider any taking of a listed species as irreparable harm would produce an irrational result" because the Endangered Species Act "permits incidental takes of a listed species" and "[i]f the death of a single wolf constituted irreparable harm, no species could be taken before it is delisted." 812 F. Supp. 2d at 1209; *see also Wild Equity Inst*, 2011 WL 5975029, at *7 (quoting *Defenders of Wildlife*'s analysis of incidental take as supporting the requirement for species-level harm); *Pac. Coast Fed'n of Fishermen's Associations*, 606 F. Supp. 2d at 1208 (holding the assertion irreparable harm means any "perceptible" effect on a species "would lead to irrational results" because "such an interpretation conflicts with other provisions of the [Endangered Species Act] that permit incidental take of a listed species").  But, in *National Wildlife Federation*, the Ninth Circuit held "the fact that section 7(a)(2) [of the Endangered Species Act] permits some incidental take of listed species does not establish that harm to individual members of a species cannot be irreparable" because "[s]ection 7(a)(2) permits incidental take *only* where [the National Marine Fisheries Service] has determined . . . the activity and level of incidental take complies with the [Endangered Species Act]."  886 F.3d at 819.

Defendants' reliance upon *Northwest Environmental Defense Center v. U.S. Army Corps of Engineers* for the proposition "the preliminary-inunction standard requires that Plaintiff[] make

a showing that the species is likely to suffer irreparable harm" for an injunction to issue is unpersuasive.  No. 3:18-CV-00437-HZ, 2019 WL 2372591, at *11 (D. Or. June 5, 2019). *Northwest Environmental Defense Center* did not address the *National Wildlife Federation* language that "[h]arm to [] members" of a species "is irreparable because [o]nce a member of an endangered species has been injured, the task of preserving that species becomes all the more difficult." *Id.* (cleaned up).  Further, *Northwest Environmental Defense Center* itself recognizes "Plaintiffs in ESA cases need not show an extinction-level threat to the listed species in the interim period in order to establish irreparable harm." 2019 WL 2372591, at *7 (cleaned up).  At oral argument, defense counsel argued examples of "irreparable harm" would be an appreciable diminishment of a protected species habitat such that the species has a diminishing prospect of survival.  However, it is unclear why such a diminishing prospect of survival would not itself qualify as an extinction-level threat.

Some district courts find irreparable harm so long as a single member of the species has been harmed.  In *Hoopa Valley Tribe v. National Marine Fisheries Service,* the defendants—as Defendants here—argued the plaintiffs "failed to show harm . . . at a species level." 230 F. Supp. 3d 1106, 1137 (N.D. Cal. 2017), *modified sub nom. Tribe v. U.S. Bureau of Reclamation, No.* 3:16-CV-04294-WHO, 2017 WL 6055456 (N.D. Cal. Mar. 24, 2017), *order clarified sub nom. Tribe v. Nat'l Marine Fisheries Serv.*, No. 16-CV-04294-WHO, 2018 WL 2010980 (N.D. Cal. Apr. 30, 2018).  The district court held "[e]vidence that the [protected species] will suffer imminent harm of any magnitude is sufficient to warrant injunctive relief."  *Id.; see also Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist., Anchorage, Alaska*, 868 F.2d 1085, 1088 (9th Cir. 1989) ("[T]he moving party must demonstrate a significant threat of irreparable injury, irrespective of the magnitude of the injury."); *California v. Trump*, 379 F. Supp. 3d 928, 956–57 (N.D. Cal. 2019), *aff'd*, 963 F.3d 926 (9th Cir. 2020) ("Contrary to Defendants' suggestion, the irreparable-injury inquiry does not require a showing of population-level harm or an extinction-level threat.").

The ESA's purpose of conserving endangered species allows for broad protections for those species—the ESA itself forbids the take of any member of an endangered species.  *See*

United States District Court
Northern District of California

15

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 (1995) (finding Congress intended "take" to be defined "'in the broadest possible manner to include every conceivable way in which a person can "take" or attempt to "take" any fish or wildlife.'" (quoting S. Rep. No. 93–307, p. 7 (1973))); *Nat. Res. Council v. Allen*, 476 F.3d 1031, 1040 (9th Cir. 2007) (finding Section 9 of the ESA "issues a blanket prohibition on the taking of any member of a listed species."); *see also, Cascadia Wildlands v. Scott Timber Co.*, 715 F. App'x 621, 624 (9th Cir. 2017) ("In its approach to evaluating irreparable harm, the district court correctly required harm to Cascadia's interest in individual members of the marbled murrelet species as opposed to harm to the entire species itself.").  So, it follows that irreparable harm, in the context of the ESA, requires proof of harm to only a single member of a listed species.

However, that does not settle the issue: Plaintiff has moved for a mandatory injunction, or an injunction requiring Defendants to "take action."  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009).  Such a "mandatory preliminary injunction . . . is particularly disfavored.  In general, mandatory injunctions are not granted unless extreme or very serious damage will result[,] and are not issued in doubtful cases."  *Park Vill. Apartment Tenants Ass'n*, 636 F.3d at 1160 (quoting *Marlyn*, 571 F.3d at 879).  Plaintiff admits he is seeking a mandatory injunction and therefore must establish "extreme or very serious damage will result" in the absence of the injunction.  (Dkt. No. 50 at 23 (quoting *Doe v.* Snyder, 28 F.4th 103, 106 (9th Cir. 2022)).

### 2.   Plaintiff's Data Collection and Analysis Fail to Establish Extreme or Very Serious Damage to the Listed Populations

Plaintiff's data collection and analysis fails to demonstrate "extreme or very serious damage" is likely to occur to the listed species if flood control releases occur this winter.  Plaintiff has failed to establish Site 4—the location at which he found elevated turbidity levels—is representative in terms of either turbidity or its salmonid population.  "Site 4 is the East Fork of the Russian River," 0.4 miles below the Coyote Valley Dam.  (Dkt. No. 50-2 ¶ 19.)  Downstream of Site 4, the water from the East Fork combines with the West Fork—diluting any turbidity effects from the Dam's water releases.  (Dkt. No. 51-1 ¶¶ 27-28.)  Thus, the elevated turbidity

United States District Court
Northern District of California

levels of Site 4 do not necessarily indicate the rest of the river experiences such an increase in turbidity.  Plaintiff did not sample any sites downstream of the Eastern Fork's confluence with the West Fork.  Moreover, Site 4 is located in a 0.5 mile stretch of the Eastern Fork between the Coyote Valley Dam and the Eastern Fork's confluence with the Russian River—a stretch which contains "little to no gravel deposition or spawning habitat" already.  (Dkt. No. 51-1 ¶ 28.)  So, even if the turbidity at Site 4 would result in 100% mortality for all CCC Steelhead and CC Chinook embryos at the sampling site, there are likely very few, if any, embryos at that location.  While Plaintiff may be correct that the reason the habitat at Site 4 is so inhospitable to salmon is, at least in part, because of past flood control releases, that explanation does not change that it is unlikely any salmonids would spawn in that 0.5-mile stretch even in the absence of any flood control releases.

Plaintiff asserts Defendants admit turbidity remains elevated outside the 0.5 stretch of the East Fork, and therefore admit the dam's water releases affect salmonids outside the East Fork region.  Defendants' own data indicates "turbidity readings are approximately 40% of source waters at Hopland, and approximately 20% at Jimtown"—meaning if the turbidity at the dam is considered "100%," then by the time the water gets to Hopland, approximately 13 miles downstream of the dam, about half of the suspended sentiment is settled and by the time water gets to Jimtown, approximately 50 miles downstream of the dam, 80% of the suspended sentiment is settled.  (*Id.* ¶ 29, Figure 3; Dkt. No 52-2 ¶ 3.)  Defendants also admit "some adverse effects to habitat, and effects to species individuals and life stages are likely occurring" because of the downstream turbidity.  (Dkt. No. 51-1 ¶ 40.)  Plaintiff argues, assuming Defendants' data is accurate, even these reduced levels of turbidity lead to a "multiplicity of cascading negative effects that constitute irreparable harm to CC Chinook and CCC Steelhead."  (Dkt. No. 52-1 ¶ 27.)

However, Plaintiff's predictions and analysis do not fit with recent historical trends in the listed species.  As discussed above, despite previous years' flood control releases, the evidence does not show Russian River salmonid populations decrease immediately following years with flood control releases as would be expected under Plaintiff's theory.  (Dkt. No. 51-1 at 15.)  Absent such evidence, Plaintiff's assertions do not support a finding of the "extreme or "very

United States District Court
Northern District of California

1   serious damage" needed to support a mandatory injunction.

2   **IV.   BALANCE OF EQUITIES AND PUBLIC INTEREST**

3   The third and fourth requirements for issuance of a preliminary injunction—balance of

4   equities and the public interest—"merge when the Government is the opposing party." *Nken v.*

5   *Holder*, 556 U.S. 418, 435 (2009).  In the Ninth Circuit, "when evaluating a request for injunctive

6   relief to remedy an ESA procedural violation, the equities and public interest factors always tip in

7   favor of the protected species." *Cottonwood Env't L. Ctr. v. U.S. Forest Serv*., 789 F.3d 1075,

8   1091 (9th Cir. 2015) (citing *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978)).  It is

9   doubtful this language means the Court cannot consider potential harm to life or property from any

10   proposed preliminary injunction relief.   Indeed, in determining whether a preliminary injunction

11   is warranted, the Ninth Circuit has weighed harm to the protected species against other factors.

12   *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d

13   755, 765 (9th Cir. 2014) ("Balancing the equities in this case requires comparison between the

14   irreparable environmental harms . . . and the economic interests of the intervenors."); *Earth Island*

15   *Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) ("[T]he district court did not clearly err in

16   finding that the economic stakes, in combination with the safety concerns and reforestation efforts,

17   outweighed any harm to environmental interests.").  *But see Sierra Club v. Marsh*, 816 F.2d 1376,

18   1388 (9th Cir. 1987) (concluding Congress, in the ESA, has "decided that the balance of hardships

19   and the public interest tip heavily in favor of endangered species" and courts "may not use

20   equity's scales to strike a different balance") (quotations and citations omitted), *abrogated on*

21   *other grounds as recognized in Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv*., 789 F.3d 1075,

22   1088–91 (9th Cir. 2015)); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 794

23   (9th Cir. 2005) (holding the district did not err "as matter of law by failing to . . . weigh economic

24   harm to the public in reaching its conclusion" because "such an analysis does not apply to ESA

25   cases because Congress has already struck the balance" in favor of endangered species).  But, as a

26   mandatory preliminary injunction is not warranted for the reasons explained above, and as the

27   relief Plaintiff seeks is not sufficiently definite nor tethered to the alleged harm as discussed

28   below, the Court does not rest its preliminary injunction decision on these factors.

United States District Court
Northern District of California

**V.    THE REQUESTED INJUNCTION IS NOT TAILORED TO REMEDY THE SPECIFIC HARM ALLEGED**

"[I]njunctive relief . . . must be tailored to remedy the *specific harm alleged*. An overb[roa]d injunction is an abuse of discretion." *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) (quoting *Lamb–Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir.1991). "There must be a significant causal connection between the alleged irreparable harm and the activity to be enjoined, but a plaintiff need not further show that the action sought to be enjoined is the exclusive cause of the injury." *Nat. Wildlife v. Nat. Marine Fisheries*, 866 F.3d 803, 823 (9th Cit. 2018) (quotations and citations omitted).  Further, Federal Rule of Civil Procedure Rule 65(d) indicates "[e]ver order granting an injunction . . . must . . . state its terms specifically."  Fed. R. Civ. P. 65(d).

 First, Plaintiff proposes Defendants "adjust Flood Control Releases to reduce the effects of turbidity on the Listed Salmonids."  (Dkt. 50 at 22.)  This proposal is fatally vague, as it does not tell Defendants how, or how much, they are required to "adjust" the flood control releases. Similarly, requiring Defendants to "begin to complete any remaining unperformed components of the terms and conditions" of Reasonable and Prudent Measure 4—which requires Defendants to "complete and begin implementation of a plan to minimize and avoid" any "adverse effects" to the listed salmonoids—does not provide specific guidelines as to how much Defendants must minimize adverse effects to the salmonids.  (Dkt. No. 1-1 at 342.)  Such an injunction would not provide Defendants with "fair and precisely drawn notice of what the injunction actually prohibits." *Union Pac. R. Co. v. Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000) (quoting *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 444 (1974)).

In *National Wildlife Federation*, 886 F.3d at 825, in contrast, the district court granted plaintiffs' requested injunction, ordering defendants to increase the amount of water that passed through the dam "spillgates" rather than through the dam's turbines, and included specific "spill" levels. *Id.* at 815 ("[P]laintiffs sought an injunction ordering the Corps to increase spill to the maximum level that meets, but does not exceed, existing total dissolved gas criteria allowed under state law (the "gas cap") from April to June at the eight mainstem FCRPS dams.")  The court also issued an injunction "ordering federal defendants to operate juvenile bypass facilities and

associated Passive Integrated Transponder ("PIT") tag detection systems."  *Id.*  Each of these orders provided specific, concrete, and measurable guidelines for the defendants, and allowed the court to later assess whether the defendants had complied with the order.  Plaintiff's proposed preliminary injunction here lacks any comparable specificity.

Plaintiff's proposed injunction is also not tailored to the specific harm alleged.  Plaintiff proposes Defendants be enjoined from making any flood control releases unless "the Army Corps determines it must make Flood Control Releases to reduce the threat to life and property below Coyote Valley Dam." (Dkt. 50 at 21.)  Plaintiff also requests anytime Defendants make a flood control release, they "report the need and any bases for the need" to obtain "up to a thirty (30) day exception to the Enjoined Releases Order from the Court." (*Id.*)  Such an injunction would not alter Defendants' flood control releases because, according to Defendants, "[a]ll flood control releases reduce the threat to life and property below the Coyote Valley Dam." (Dkt. No. 51-2 ¶ 21).  Moreover, requiring Defendants to submit a report to the Court each time Defendants perform a flood control release would have no impact on the listed salmonids.

At oral argument, Plaintiff argued Defendants' flood control releases could be more "elegant"—for example, by timing flood control releases so they correspond with storms that raise the turbidity in the natural waters—and asserted the proposed injunction would encourage this "elegance" by forcing Defendants to explain their actions to the Court. (Dkt. No. 50-2 ¶ 33.)  For example, Plaintiff believes that earlier this year, Defendants could have reduced the amount of water released while still complying with FIRO (Forecast Informed Reservoir Operations) and the Flood Control Manual.  (*Id.* at 50-2 ¶ 34.)  But how would such an injunction work?  If Defendants reported they engaged in a flood control release that Plaintiff thinks could have been performed differently and involve less turbidity, the Court would do what?  As for releasing water around storms, Plaintiff has not asked for a preliminary injunction telling Defendants they must do so.  And for good reason, as there are many factors to go into flood control releases and Plaintiff has not shown that ordering Defendants to do as he proposes in his declaration would comply with the procedures currently governing flood control releases.  (*See* Dkt. No. 51-2 ¶¶ 15-17, 21, 25-26.)  And merely requiring Defendants to report to the Court does nothing to affect turbidity, but it

United States District Court
Northern District of California

1   does expend Defendants' resources.

2      Plaintiff cites *Roman v. Wolf* for the proposition the Court has broad discretion to grant

3   equitable relief, even relief that requires a defendant to meet a somewhat amorphous legal

4   standard. 977 F.3d 935 (9th Cir. 2020). In *Roman*, the plaintiffs moved for a preliminary

5   injunction against those operating the Immigration and Customs Enforcement Processing Center

6   in which they were detained. *Id.* at 938. The plaintiffs alleged in light of the COVID-19

7   pandemic, the defendants' failure to implement necessary protective measures placed plaintiffs at

8   risk of contracting COVID-19 and therefore violated the plaintiffs' due process rights under the

9   Fifth Amendment. *Id.* at 939. The district court:

> granted a preliminary injunction that, *inter alia*, imposed a
> moratorium on [the defendant's] receipt of new detainees, required
> specific sanitation measures, mandated compliance with guidance
> issued by the U.S. Centers for Disease Control and Prevention
> ("CDC"), and ordered the facility's detainee population to be reduced
> to a level that would enable social distancing. The district court left
> to the Government's discretion whether to achieve the requisite
> population reduction by deporting selected detainees, transferring
> selected detainees to other facilities, or releasing selected detainees
> with appropriate conditions of release. The court likewise allowed the
> Government to determine which detainees to release, deport, or
> transfer.

*Id.* The Ninth Circuit "affirm [ed] the portions of the preliminary injunction order concluding that

the district court possesses the power to grant injunctive relief," but "vacate[d] the provisions of

the preliminary injunction that ordered specific measures" because in the five months in between

the district court's order and the Ninth Circuit's order, the "circumstances [] changed

dramatically." *Id.* at 945. The Ninth Circuit "reiterate[d] that the district court possesses broad

equitable authority to remedy a likely constitutional violation," and explained the "district court

may, for example, require the provision of sufficient cleaning supplies and hand sanitizer, or a

reduction in the population to a level that would allow for six-foot social distancing." *Id.* at 945–

46. However, the Ninth Circuit went on to say the CDC's guidelines "do not provide a workable

standard for a preliminary injunction" because they "lack specificity" which "makes it a poor

guidepost for injunctive relief." *Id.* at 946. Similarly, here, Plaintiff's proposed injunction does

not provide a "workable standard" for Defendants, especially because Defendants assert every

flood control release is performed to protect life or property and Plaintiff cites no evidence to the contrary.

In sum, Plaintiff's proposed injunction does not have a sufficient causal connection to the harms alleged, and it does not provide a specific standard for Defendants to follow.

### CONCLUSION

Plaintiff seeks a mandatory preliminary injunction involving flood control dam releases. But he has not shown that in the absence of his proposed injunction, "extreme" or "very serious damage" will befall the Russian River salmon this coming year.  And, he has also failed to demonstrate how his proposed preliminary injunction would remedy the alleged harms.  For both of these independent reasons, Plaintiff's motion for a preliminary injunction is DENIED.

**IT IS SO ORDERED.**

This Order Disposes of Docket Number: 50.

Dated: October 23, 2023

JACQUELINE SCOTT CORLEY
United States District Judge